### THE STATE v. JORDAN PRITCHETT.

*Homicide—Evidence—Insanity—Jury—Challenge—Judge's Charge.*

1. Where it appeared that the prisoner did not exhaust his peremptory challenges, error in the Court in its ruling upon the competency of a juror challenged by the prisoner is not good ground for a new trial.

2. The declarations and acts of one charged with an offence, after its commission—not of the *res gestæ*—are not competent evidence for him.

3. Where the testimony showed that, after the commission of the offence, and pending the trial, the prisoner was committed to the asylum for the insane upon a verdict that he was incompetent to plead, but was afterwards put upon trial and plead "not guilty," and there was some evidence that the insanity was feigned: *Held* not to be error to permit the State, upon cross-examination, to ask him "why he played off crazy."

4. Evidence of the condition of a pistol (with which it is alleged the homicide was committed) on the morning after, was competent.

5. Where a party charged with the commission of a crime has been committed to the asylum for the insane because of insanity supervening after the offence and existing at the time he was called upon to plead, the Court does not lose jurisdiction by reason of his commitment, but it may, without any discharge or other formal action on the part of the asylum authorities, cause him, from time to time, to be brought before the Court for examination, and. whenever it is ascertained that he is competent to plead, may put him upon trial.

6. The opinion of the superintendent of the asylum as to the mental condition of the prisoner while under his charge is competent evidence upon the question whether such insanity was feigned.

7. Where no instruction is asked to "state, in a plain and correct manner, the evidence given in the case, and declare and explain the law arising thereon," the failure of the Court to comply with the statute in that particular will not be sufficient ground for a new trial, especially where the "case on appeal" shows that the charge of the Court presented the case in the most favorable light for the defendant.

This was an INDICTMENT FOR MURDER, tried at Spring Term, 1890, of GRANVILLE Superior Court, *Armfield, J.,* presiding.

The prisoner was charged with the killing of one Moseley by shooting him with a pistol, at night, in a house where he and a number of other colored people were assembled. The prisoner denied the killing, and, among other things, proposed to show that Amos Hodnett and prisoner were both arrested on the Monday after the homicide, and, pursuant to direction given a witness (then being examined) by Amos Hodnett, witness sent and got his pistol, which was a 32 calibre pistol.

This was objected to on the part of the State. Objection sustained, and prisoner excepted.

The defendant then proposed to show by same witness that, pursuant to directions given by prisoner, witness sent and got prisoner's pistol, which was a 38-calibre pistol.

Objection on the part of the State. Objection sustained, and defendant excepted.

The defendant proposed to show by witness that the pistol admitted to be Amos Hodnett's on the coroner's inquest was a 32-calibre "American Bulldog" pistol.

This was objected to on the part of the State. Objection sustained, and prisoner excepted.

The defendant then proposed to show by witness that when he arrested Amos Hodnett, he searched said Hodnett and found some 32-calibre cartridges on his person.

This was objected to on the part of the State. Objection sustained, and defendant excepted.

Defendant proposed to prove that Amos Hodnett said that he had a 32-calibre pistol at Dicey Smith's, and produced it on the trial.

Objection on the part of the State. Objection sustained. Defendant excepted.

The ball which was extracted from deceased's body was much battered, and a good deal of testimony was introduced, but of a very vague character, as to whether it was a 32 or 38-calibre

The facts pertinent to the other questions discussed by the Court are stated in the opinion.

The prisoner was convicted, and appealed from the judgment of death pronounced against him.

*The Attorney General* for the State.
*Mr. N. Y. Gulley,* for defendant.

MERRIMON, C. J : In selecting the jury in this case, the prisoner challenged a person tendered as a juror for cause assigned. The objection was not sustained by the Court, and the prisoner excepted. It appears that a jury was obtained before the prisoner had exhausted his right to challenge peremptorily. It is settled that such exception cannot be sustained. *State* v. *Hensley*, 94 N. C., 1021, and cases there cited.

The evidence rejected on the trial, referred to in, and embraced by, the exceptions numbered respectively 2, 3, 4, 5, 7, was not competent. It referred to what was said and done after the homicide, on the occasion of the inquest held by the coroner, in respect to the two pistols, one said to have been that of the prisoner, and the other that of another party. If the facts intended to be proven in respect to the ownership of these pistols, their calibre, &c., could be pertinent and competent at all, evidence to prove them should have been produced on the trial without reference to the evidence in respect to them at the coroner's inquest. Moreover, the prisoner could not be allowed to show after the homicide, and after he was arrested, that he "sent and got his pistol," and that of another party, to be examined with a view to his exculpation. This is so, because he could not be allowed to have opportunity to make evidence in his own behalf. Besides, the evidence, if it had been properly offered, was not of itself relevant. It might have tended very vaguely, remotely and indirectly to show that another person killed the deceased. In possible cases the prisoner might show that a person other than himself slew the deceased, but in such cases "the proof must be direct to the fact, and cannot come from admission or conduct seemingly in recognition of it," of facts that simply give rise to vague conjecture. State v. Gee, 92 N. C., 756.

The prisoner was examined at the trial as a witness in his own behalf, and on the cross-examination the Solicitor for the State asked him "what he played off crazy for?" having reference to the fact that he, at a former term of the Court, professed to be, or was, insane at the time the action stood for trial. The prisoner objecting, the Court allowed the question to be put. We think it was pertinent and competent. If the prisoner had answered substantially that he did feign insanity, such answer would have gone to his discredit and tended, in connection with other evidence,

to prove guilt. It would have shown a disposition and a strong purpose to evade justice.

The objection to allowing the witness for the State to testify as to the condition of the pistol with which the prisoner killed the deceased the next morning after the homicide was not well founded. The inquiry proposed, though rather general, was such as would probably elicit evidence pertinent and competent. The evidence called for might have identified the pistol and shown that it had recently been discharged. The evidence given tended to identify it, and otherwise, so far as we can see, it was not of much, if. any, importance.

Likewise, the objection to allowing the examination of the Superintendent of the Insane Asylum as a witness for the State in respect to the mental condition of the prisoner while he was in the asylum as a patient cannot be sustained. It was pertinent and proper to ascertain whether the prisoner was insane or otherwise at the time he was committed to the asylum under the order of the Court, and whether, if he was insane, as the jury had found him to be, he had recovered his sanity sufficiently to be tried for the offence charged against him. The evidence elicited was important. It tended to show that it was questionable whether the prisoner was insane, as the Court supposed he was, and that if he was, he had recovered his sanity, and might properly be put upon his trial.

When the prisoner was first brought into Court and required to plead to the indictment, his counsel suggested that he was insane and incapable of pleading. Thereupon, the Court submitted to a jury a proper issue as to his sanity, and it found that he was sane. The action was then continued. At the next term of the Court the prisoner's counsel again suggested that he was then insane and could not plead. Thereupon, a second jury found that he was insane, and the Court made its order, directing that the prisoner

" be confined in the Lunatic Asylum at Goldsboro, in said State, for treatment by the authorities thereof until his mind may be restored so that he may be competent to plead to the indictment against him in this behalf, upon the happening of which event the authorities of said asylum are hereby ordered to notify the Clerk of the Superior Court for the county of Granville, to the end that he may be returned to said county for trial." In pursuance of this order the pris- oner was committed to the asylum, and, having remained there several months, escaped therefrom. While he so escaped, he was retaken, pleaded to the indictment not guilty, put upon his trial and convicted. From the judgment of death he appealed. Here his counsel insisted that he could not be required to plead, and be put upon his trial, until the proper authorities of the insane asylum had duly certified that he had recovered his sanity, &c. This contention is not well founded.

The law does not intend or allow that a person of suffi- cient age to commit a criminal offence, and sane at the time he commits such offence, shall, because of subsequent in- sanity, go unpunished, if afterwards he recover his sanity. Temporary insanity does not destroy or abridge his duty, obligations and amenability to society and government, except while he is so affected. His sanity restored, he is amenable for criminal offences committed when he was sane, on the same footing as other people, and for the like reasons. The statute (*The Code*, § 2255) allowing and requiring Judges of the Superior Courts to commit insane persons, charged with criminal offences in the cases specified, to the proper insane asylum, does not imply or intend that such persons so committed shall remain there after they are cured or restored to sanity. It does not so provide in terms, or by implication, nor does it provide that the authorities of such asylums shall discharge such persons, as in cases where insane persons not charged with crime may be discharged.

In the absence of such express authority conferred, it is not to be presumed or merely implied that the Legislature intended that such persons restored to sanity shall be discharged and turned loose upon the public. Nor does the statute confer upon the constituted authorities of an asylum, or any of its particular officers, authority to ascertain and determine when an insane person, charged with crime and committed to the asylum, shall be sent to the Court to be tried for the offence charged against him. Such insane person is committed to the insane asylum by the proper Judge to be there kept securely, treated for his disease or diseases, physical as well as mental, cured, if practicable, and when he is cured, the superintendent of the asylum, or some authority thereof designated for the purpose, should notify the Clerk of the County having jurisdiction of the offender that he is restored to sanity, to the end the Court, through its officers, may take proper steps to bring the party to trial, or discharge him according to law, except that when a party has been acquitted of an offence charged against him, because of insanity at the time he committed the alleged offence, and was committed to the asylum, may be discharged by the authorities of the asylum as in cases of insane persons not charged with crime. This is so, because the person so acquitted of crime is not to be held to answer further.

The Court does not lose its jurisdiction of a person charged criminally before it by reason of his insanity and the order committing him to the asylum. He is sent there simply for the purpose already indicated. · The Court may make inquiry from time to time as to his mental condition, and to that end bring him before it. While it ought, and will, ordinarily, pay great respect and deference to the judgment and opinions of the authorites of the asylum as to the patient's mental condition, it may exercise its authority by proper inquiry, and determine that the party is, or is not,

106—43

sufficiently restored to sanity to be required to plead and be put on his trial. It may cause the party in the asylum to be brought before it by *habeas corpus*, or, in some cases, no doubt, by appropriate order; and when the party has escaped from the asylum he may be arrested upon *capias*, or in any way allowed by law, and taken before the Court; or, if insane, he may at once be returned to the asylum. The Court's authority is paramount, and hence, whenever the party charged is brought before it, without regard to whether he escaped from the asylum or not, it may make proper inquiry as to his mental condition, and if it be found that he is restored to sanity, require him to plead and be put upon his trial, or, if.it be found that he is still insane, recommit him to the asylum. Nor is it necessary, where manifestly the party is restored to sanity, to make formal inquiry as to his mental condition; but the Court should be cautious in this respect and fully satisfied that the party is sane. It is the province of the Court to determine the sanity or insanity of the person charged with crime.

It will be observed that the statutory provision (*The Code*, § 2255) conferring authority upon Judges to commit insane persons charged criminally to insane asylums is exceptional, and there is no express statutory provision prescribing how such persons committed are to be discharged when restored to sanity. It is, hence, necessary to resort to a reasonable interpretation of the statute and the application of general principles of law. This we have endeavored to do in this case. The prisoner appeared to be sane. There was evidence to prove his sanity, and, indeed, it was not suggested that he was not sane when he pleaded not guilty and was put upon his trial.

The Court was not requested, on the trial, to "state in a plain and correct manner the evidence given in the case, and declare and explain the law arising thereon" to the jury, nor was there any objection or exception in the Court below

on that account.    In this Court, the counsel for the prisoner, in his earnest argument, insisted that the Court was bound, without special request, to so state the evidence and the law to the jury, and he relied upon *State* v. *Boyle*, 104 N. C., 800. In the latter case the Court was expressly requested to so state the evidence and the law, and that it did not, was assigned as error.    In this case the evidence was not at all complicated or peculiar in its application and bearings; it was simple and easily understood.    The Court directed the attention of the jury to it, not as fully as it should have done, but, as to the prisoner, it expressly directed their attention to the material evidence in his behalf, and to the view of it most favorable to him, and told them that if it was true, he was not guilty, and they should so find.    So he had no just ground of complaint in such respect.    He could rely for his acquittal only upon his own evidence.    The evidence against him was plain, direct, abundant and strong.    If it was true, as the jury found it to be, the prisoner slew the deceased, an unoffending man, without the slightest provocation.    The superintendent of the asylum said in his examination that he possessed "eccentricities and peculiarities," but these could not excuse his great crime.    Indeed, the defence of insanity was not at all relied upon.

Judgment affirmed.